IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM W. BENNETT, JR.<br>2237 Sudbury Road, NW<br>Washington, DC 20012<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>CHERYL A. LaFLEUR<br>Acting Chairman, Federal Energy Regulatory<br>Commission<br>888 First Street, NE<br>Washington, DC 20426<br>　　　　　　　　　Defendant. | Civil Action No.: 1:14 CV 00921 |

## COMPLAINT

(Race Discrimination and Reprisal in Federal Employment)

1.　　William Bennett, an experienced and talented member of the Senior Executive Service, was denied selection because of his race for a position for which he was rated to be among the Best Qualified. Indeed, the selecting official brazenly told Bennett that he would not interview him or otherwise consider him for the job, even though Bennett earned inclusion on the Best Qualified list. Defendant then selected a less qualified white applicant for the position, and has engaged in a series of continuing reprisals against Bennett after he protested his treatment and engaged the EEO complaint process.

2.　　Although Bennett has earned degrees from Harvard College (B.A in Economics), University of Chicago Law School (J.D.), and Howard University School of Divinity (Theology), and had an unblemished record of service for the Federal Energy Regulatory Commission (FERC) for more than twenty years in which he won repeated awards, FERC management now

treats him as an incompetent malcontent after he raised complaints of racial discrimination. The reprisals have included singling Bennett out as the *only* member of the SES to receive a Minimally Successful performance evaluation – a rating that was wholly unjustified – and removing him from all managerial functions, while assigning him to a staff equivalent "advisor" role which, among other things, places him at risk for job elimination through Reduction in Force. FERC's actions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-16, and have caused Bennett significant harm to his career and emotional distress.

## Jurisdiction and Venue

3. This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. This Court has jurisdiction under 42 U.S.C. §§ 2000e-5(f)(3) and 2000e-16(c). Venue lies in this Court because the discriminatory and retaliatory employment practices challenged in this action took place in the FERC's offices located in the District of Columbia, where all relevant parties worked.

## Parties

4. Plaintiff, William W. Bennett, Jr., is a resident of the District of Columbia and is employed as a member of the Senior Executive Service with FERC in the District of Columbia. He is African-American.

5. Defendant, Cheryl A. LaFleur, is the acting Commissioner of FERC, and is the acting head of the agency in which plaintiff was employed. She is being sued solely in her official capacity. FERC has more than 500 employees.

## Facts

6. William Bennett has worked for FERC for twenty-three years, having begun his

career as a Trial Attorney in the Office of Hydroelectric and Electric Litigation, Office of the General Counsel, in 1991. Even prior to joining FERC, Bennett developed expertise litigating energy law issues as a founding member of the law firm Bennett & Robinson. Bennett earned a Bachelor of Arts degree from Harvard College, a law degree from the University of Chicago Law School, and a Theology degree from Howard University School of Divinity. Since joining FERC, he earned Performance Awards as a FERC Supervisory Attorney and after his promotion into the Senior Executive Service in 2000.

*Racial Discrimination*

7. On April 25, 2011 FERC posted for competition the position of Director, Legal Division, ES 905.

8. Bennett timely applied for the position, and was rated by a screening panel reviewing all of the applications to be among the six highest qualified candidates for the position. The screening panel referred this "Best Qualified" list to the selecting official, Ted Gerarden, Director of the Office of Administrative Litigation.

9. On June 16, 2011 Gerarden met with Bennett and acknowledged that he had received the Best Qualified list from human resources and that Bennett was on it. Gerarden then informed Bennett that he was planning on interviewing the other internal referred candidates (all of whom were white), but did not intend to interview Bennett because he was not considering him for selection to the Director, Legal Division position. Bennett protested being excluded from the interview list, and told Gerarden that he was violating the integrity of the process by refusing to give him any serious consideration for the job, notwithstanding his evident qualifications.

10. On June 17, 2011 Bennett wrote to Eduardo Ribas, Chief Human Capital Officer, and the executive who oversees FERC's Human Resource function, and complained about being excluded from the selection process. Bennett also asked about his rights to challenge this action, and Ribas responded that Bennett could raise an EEO claim with FERC's Office of Civil Rights, and referred him to the responsible official.

11. On June 23, 2011 Gerarden informed Bennett that he would afford him a courtesy interview to "learn more" about him, but that he was still not going to actually consider selecting him for the job.

12. Gerarden's interview of Bennett occurred on June 28, 2011, but was a sham designed only to counter Bennett's complaint about being excluded from the process.

13. Gerarden "recommended" the selection of John Kroeger for the vacant Director, Legal Division position on July 5, 2011, and Chairman Jon Wellinghoff approved of the selection the next day. However, FERC did not announce the selection of Kroeger for the position until mid-November 2011, because Kroeger was not a member of the SES and needed to obtain approval for his promotion from the Office of Personnel Management. During the interim period between Gerarden's recommendation of Kroeger and his announcement that Kroeger had been selected, Gerarden, Ribas and Sid Rocke (an attorney from FERC's Office of General Counsel experienced in employment discrimination defense) met to discuss the selection of Kroeger. By the time of those meetings, Ribas had already heard Bennett's complaint about being excluded from the selection process, and referred him to the EEO office.

14. William Bennett was significantly better qualified for the Director, Legal Division position than John Kroeger. The position was an SES level job which required "Executive Core

Qualifications" focused on leading change and leading people. Bennett was already a member of the Senior Executive Service, and had successfully served at the executive level since 2000. Kroeger, on the other hand, was not a member of the SES and had more limited executive level experience than did Bennett. Similarly, with respect to the specific position at issue and the "technical" qualifications needed for the job, Bennett had broader experience in the field of energy regulation and litigation in general, and more targeted experience relevant to the position, than did Kroeger.

15. The primary responsibility of the Director, Legal Division position was to manage the work of the trial attorneys handling administrative litigation of complex energy industry cases. Bennett had spent virtually his entire career engaged in hands-on litigation of energy industry cases (both before and after becoming employed with FERC). Indeed, prior to applying for the position at issue, Bennett had served since September 2002 (nearly ten years) as Special Counsel to OAL, leading teams of attorneys and staff handling the most complex and novel oil, natural gas and electric cases set for hearing by the Commission. In that capacity, FERC awarded him a performance bonus for his excellent service.

16. John Kroeger, in contrast, had worked in a position which focused on the "investigation" of administrative complaints, a function that is very different than litigation. Kroeger had significantly less litigation experience in general than Bennett, and had handled far fewer complex energy industry cases – the very type of litigation that the Director would oversee in this job.

17. Almost immediately upon assuming the Director position, Kroeger made statements to Bennett and others in which he described having very little prior experience in

litigation of matters similar to those being handled in OAL, and conceded that he would need time to learn the substantive law and procedures relating to such cases.

18. In addition to Ted Gerarden's admission at the beginning of the process that he would not consider Bennett for selection, Gerarden also made statements that reflected a racially stereotypical view of Bennett. Specifically, Gerarden told Bennett after his *pro forma* interview that he perceived Bennett to be "unfriendly," "reserved" and "a loner."

19. These "perceptions" of Bennett voiced by Gerarden had no basis in fact, nor were they a legitimate view of Bennett's management style or interactions with his colleagues. To the contrary, after Bennett contacted an EEO counselor to raise concerns about Gerarden's refusal to fairly consider him for the job, the counselor interviewed subordinates and coworkers, who both anonymously and on the record described Bennett as a manager who maintained an open door policy, was easy to talk to, and who was "approachable" and "professional." When Gerarden told Bennett that he considered him to be "unfriendly," "reserved" or a "loner," he also said that this was the "rap" on Bennett, and that he had heard it from Chairman Jon Wellinghoff and his Chief of Staff, James Pederson. In his affidavit responding to Bennett's claims during the EEO process, however, Pederson specifically denied ever expressing that perception about Bennett to Gerarden, and instead testified that he considered Bennett to be a "friendly" person. Ted Gerarden's skewed perception of Bennett as "unfriendly," "reserved" and a "loner," was shaped by a stereotypical view of Bennett as an angry Black man, rather than on any genuine experience or interaction.

20. Although Chairman Wellinghoff was nominally designated to be the "selecting official" for the Director, Legal Division job, in fact it was Ted Gerarden who served in that

functional capacity. He reviewed the credentials of the people referred to him on the Best Qualified list, he decided who to interview, and he conducted the interviews by himself. Commissioner Jon Wellinghoff's review was *pro forma;* indeed, his Chief of Staff James Pederson has testified that Mr. Wellinghoff never altered the selection preference of an Office Director. Ted Gerarden's "recommendation" to the Chairman about who to select was tantamount to the selection itself.

21. Defendant refused to select, or even consider, William Bennett for the Legal Division Director position because of his race (African-American) and instead chose a less qualified white applicant for the position.

*Retaliation*

22. Bennett first engaged in protected activity with respect to the Director, Legal Division position by reporting to Chief Human Capital Officer Eduardo Ribas that he was being excluded from the process, and by asking about his rights to challenge Gerarden's refusal to consider him for the job. Ribas responded by referring Bennett to the EEO office.

23. After the selection decision was announced, Bennett formally initiated the EEO process by timely contacting a FERC EEO counselor on November 21, 2011, alleging that he was the victim of race discrimination by being denied selection and any fair consideration for the Director, Legal Division job, and then filed an official complaint of discrimination on January 20, 2012.

24. Prior to learning that Bennett had challenged his racially discriminatory conduct, Ted Gerarden had issued records evaluating Bennett as either exceeding or meeting all of the performance targets for his job. Gerarden did not contend that Bennett was failing to perform in

any element of his job. Similarly, prior to having learned that Bennett had engaged in protected activity, Gerarden appointed Bennett to the position of Technical Division I, supervising a staff that comprised of two teams of experts -- the Engineering Analysis Branch and Competition Analysis Branch.

25. Gerarden has testified that he found Bennett's assertions of race discrimination to be "highly offensive."

26. Gerarden began to engage in a series of retaliatory actions designed to both punish Bennett for having complained about him, and to prepare his defense to Bennett's complaint, by falsely portraying Bennett as a poor performer and an incapable manager. On November 18, 2011, Gerarden began this process by holding a tense meeting with Bennett in which he accused him of a number of performance deficiencies, and said that, were he to rate Bennett at that point (just barely two months into the rating cycle) his evaluation would be "minimally successful." There was no merit to these allegations of performance deficiencies, and Gerarden knew that they were contrived. For example, Gerarden faulted Bennett for his working relationship with one of his direct reports, while at the same time conceding that she was a difficult employee to manage. He also criticized Bennett for the performance evaluation ratings Bennett had given to his staff, even though Gerarden had specifically approved each of the evaluations.

27. On August 28, 2012, Gerarden issued a final appraisal rating Bennett's performance for the year at the Minimally Successful level. This was the only time in Bennett's twenty-one year career in the federal service that any supervisor had ever rated his performance as below Fully Successful. Moreover, of the 46 members of FERC's Senior Executive Service in 2012, Bennett was the *only* one to receive a rating of less than Fully Successful. Upon

information and belief, he was also the *only* member of the SES with a pending EEO complaint at the time of the rating. Unlike the vast majority of the SES employees, Bennett did not receive any performance bonus for 2012, nor did he receive any upward adjustment to his salary because of this poor rating. There was no legitimate basis for the Minimally Successful appraisal, and it was motivated by unlawful retaliation. In fact, Bennett's performance was very good, and certainly good enough to merit at least a Fully Successful evaluation. His team met or exceeded every objective performance measure they had been given, and indeed Gerarden approved of exemplary ratings of the Branch Managers and staff performing the substantive work that Bennett had been managing.

28. Another member of Gerarden's staff has also alleged that after she reported concerns of discrimination and harassment in the workplace, Gerarden retaliated by giving her an unfairly low performance appraisal.

29. Barely two weeks after issuing this retaliatory performance appraisal, Gerarden imposed more reprisal by removing Bennett from his managerial position as Director, Technical Division I, and assigning him to an "advisor" role working on "special projects" assigned by Gerarden. The actual duties of this position are akin to a staff level position, with less responsibility than Bennett had exercised at any prior point in his career with FERC, and is not remotely commensurate with the duties of a member of the Senior Executive Service. Moreover, some of the responsibilities overlap with the work performed by other functions within FERC. This assignment puts Bennett at risk for future adverse action, including increasing the chance that his position would be targeted for reduction in force in any future reorganization or demoted out of the SES. It also makes it extremely unlikely that Bennett will ever have a meaningful

opportunity to regain a true SES level position. There was no legitimate basis to remove Bennett from his former role as Director, Technical Division I, and it was motivated by unlawful retaliation.

30. In addition to the retaliatory performance rating, denial of bonus, and reassignment, FERC management now treats Bennett with relentless suspicion and hostility.

31. Defendant's actions, as set forth above, have damaged William Bennett's long and successful career in the federal service, and caused him significant emotional distress, anxiety, pain, humiliation, and loss of enjoyment of life, as well as pecuniary losses.

## Exhaustion of Administrative Remedies

32. Plaintiff timely asserted his rights during the administrative process and properly exhausted his administrative remedies. All of the prerequisites to suit have been satisfied.

## VIOLATIONS OF LAW

### COUNT ONE

### (Race Discrimination)

33. Paragraphs 1-32 are re-alleged. Defendant's actions as described above discriminated against Plaintiff because of his race, and violated Title VII of the Civil Rights Act of 1964, as amended.

### COUNT TWO

### (Reprisal)

34. Paragraphs 1-32 are re-alleged. Defendant's actions as described above retaliated against Plaintiff because of his opposition to racially discriminatory behavior and his protected complaints of race discrimination, and violated Title VII of the Civil Rights Act of 1964, as

amended.

## Relief

Plaintiff asks the Court to grant the following relief:

1. Declare that defendant's actions as set forth above violated plaintiff's rights under Title VII;

2. Order defendant to instate plaintiff into the position of Director, Legal Division (or an equivalent position if the Court determines such equitable relief to be unwarranted), retroactive to the date of his unlawful non-selection for the position, and pay plaintiff all back pay, bonuses and/or other benefits, with pre-judgment interest, he has lost as a result of this action;

3. Award plaintiff compensatory damages for the pain, suffering, loss of enjoyment of life, and other injuries defendant's actions have caused, in an amount to be proven at trial;

4. Order defendant to cease and desist from all future discrimination and retaliation against plaintiff;

5. Cancel and expunge from plaintiff's official personnel files the unlawful Minimally Successful performance rating, and all memoranda preceding and/or relating to it, and order defendant to replace such rating with an appropriate, non-retaliatory appraisal, and award to Plaintiff any performance bonus he has been denied due to this retaliatory rating.

6. Order defendant to pay plaintiff's costs, including reasonable attorney fees and any other costs allowed by law, for this action and for the administrative proceedings which he was required to exhaust before bringing this action;

7. Award prejudgment interest as allowed by law;

8. Maintain jurisdiction over this matter until such time as all remedial action has been

taken by the defendant;

    9. Order such other and additional relief as the Court deems just and equitable.

### Jury Demand

Plaintiff demands trial by jury.

/s/ Richard Salzman
_____
Richard A. Salzman 422497
Douglas B. Huron 89326
HELLER, HURON, CHERTKOF
& SALZMAN
1730 M Street, N.W.
Suite 412
Washington, DC  20036
(202) 293-8090

Attorneys for Plaintiff